[Cite as *State v. Lashley*, 2017-Ohio-4026.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 16 MA 0094 |
| VS. | ) | |
| | ) | OPINION |
| ELIJAH J. LASHLEY, SR. | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Mahoning County, Ohio
Case No. 2015 CR 563

JUDGMENT: Affirmed in part; reversed in part and remanded.

APPEARANCES:
For Plaintiff-Appellee

Attorney Paul Gains
Mahoning County Prosecutor
Attorney Ralph Rivera
Assistant Prosecutor
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503-1426

For Defendant-Appellant

Attorney John Ams
134 Westchester Drive
Youngstown, Ohio 44515

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: May 26, 2017

DeGENARO, J.

{¶1} Defendant–Appellant, Elijah Lashley, Sr. appeals the judgment of the Mahoning County Court of Common Pleas convicting him on two counts of kidnapping and two counts of felonious assault, denying his pro se pre-sentence motions to withdraw his guilty plea, and sentencing him accordingly. Appointed appellate counsel for Lashley has filed a no-merit brief and a request to withdraw as counsel pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.E.2d 493 (1967), and *State v. Toney*, 23 Ohio App.2d 203, 262 N.E.2d 419 (1970).

{¶2} After conducting an independent review of this case, the appeal is not frivolous and there exists one meritorious issue; specifically regarding consecutive sentence findings. Although the trial court made sufficient findings during the hearing, it failed to make specific findings in the judgment entry, instead cutting and pasting the entirety of R.C. 2929.14(C)(4) into the entry. Accordingly, the judgment of the trial court is reversed and this matter is remanded for the trial court to issue a nunc pro tunc sentencing entry that includes the applicable specific consecutive sentence findings. *See State v. Williams*, 7th Dist. No. 16MA0041, 2017-Ohio-856.

### Facts and Procedural History

{¶3} On June 11, 2015, Lashley was indicted on 10 counts: counts 1 through 5 for rape, R.C. 2907.02(A)(2)(B), first-degree felonies; counts 6 through 8 for kidnapping, R.C. 2905.01(A)(4)(C), R.C. 2905.01(A)(2)(C), R.C. 2905.01(A)(3)(C), respectively, first-degree felonies; and counts 9 and 10 for felonious assault, R.C. 2903.11(A)(1)(D), R.C. 2903.11(A)(2)(D), second-degree felonies. He was accused of raping, kidnapping and assaulting his wife, K.J.

{¶4} Lashley was arraigned, pled not guilty and counsel was appointed. He later entered into a Crim.R. 11 plea agreement with the State. Therein, Lashley agreed to plead guilty to counts 7 through 10, two counts of kidnapping and two counts of felonious assault. In exchange, the State agreed to dismiss counts 1 through 6, all five counts of rape and one count of kidnapping and recommend a 10-year prison sentence.

{¶5} During the plea hearing the trial court engaged in a colloquy with

Lashley concerning the rights he would give up by pleading guilty, and ultimately accepted Lashley's plea as knowingly, voluntarily and intelligently made and continued sentencing so that a presentence investigation could be prepared.

{¶6} Several weeks later, Lashley filed a series of pro se motions to withdraw his guilty plea. In these motions, Lashley claimed he had additional evidence to present in his defense and claimed his guilty plea was not actually an admittance of guilt but an acknowledgement that racism still existed; he claimed his attorney told him that a white suburban jury would not believe him as an African American male with a criminal history. Lashley also claimed counsel was ineffective for allegedly losing exculpatory evidence he gave to him.

{¶7} During a hearing on March 15, 2016, the pro se plea withdrawal motions were addressed first. Defense counsel stated that he was just learning about the pro se motions for the first time that morning, despite the fact that he visited Lashley in jail the day before. Defense counsel accordingly deferred to his client to speak on those matters. Thereafter, arguments were made by Lashley, pro se, and by the prosecutor regarding the plea withdrawal motions, which were overruled by the trial court.

{¶8} The State stood by its promise to recommend a 10-year prison sentence. Defense counsel made arguments in favor of a lesser sentence. The trial court asked Lashley if he had anything to say regarding his sentence and Lashley made a statement. The victim made a lengthy statement detailing the crimes and the serious impact it had on her life. The State presented as exhibits two photographs of the victim taken soon after the crimes.

{¶9} At the close of the hearing, the trial court sentenced Lashley to ten years each for counts 7 and 8, the two kidnapping charges, to run concurrently to each other; and three years each on counts 9 and 10, the two felonious assault charges, to run concurrently to each other. Counts 7 and 9 were ordered to run consecutively to one another for an aggregate prison term of 13 years. The trial court also imposed a mandatory five-year term of post-release control, and explained the

ramifications of violating post-release control. The trial court failed to make any consecutive sentence findings during this hearing.

{¶10} However, before the sentencing entry was issued, the trial court reconvened the parties for a resentencing hearing to address the issue of consecutive sentences. First, however, counsel for both sides made brief sentencing arguments, and the trial court again asked Lashley if he had anything to say pertaining to sentencing and Lashley made a brief statement.

{¶11} The trial court then made the required consecutive sentence findings. The trial court sentenced Lashley to ten years each for counts 7 and 8, the two kidnapping charges, to run concurrently to each other; and three years each on counts 9 and 10, the two felonious assault charges, to run concurrently to each other. Counts 7 and 9 were ordered to run consecutively to one another for an aggregate prison term of 13 years. The trial court also imposed a mandatory five-year term of post-release control and explained the ramifications of violating post-release control.

{¶12} On May 9, 2016, the trial court issued its sentencing entry, in which it imposed the 13-year sentence along with 5 years of mandatory post-release control. However, instead of making specific consecutive sentence findings which were made during the hearing, the entirety of R.C. 2924.14(C)(4) was cut and pasted into the entry. On July 1, 2016, Lashley filed a pro se motion for leave to file a delayed appeal, which this court granted.

### *Anders* Review

{¶13} An attorney appointed to represent an indigent criminal defendant may seek permission to withdraw if the attorney can show that there is no merit to the appeal. *See generally Anders*, 386 U.S. 738. To support such a request, appellate counsel is required to undertake a conscientious examination of the case and accompany his or her request for withdrawal with a brief referring to anything in the record that might arguably support an appeal. *Toney*, 23 Ohio App.2d at 207. Counsel's motion must then be transmitted to the defendant in order to assert any error pro se. *Id.* at syllabus. The reviewing court must then decide, after a full

examination of the proceedings and counsel's and the defendant's filings, whether the case is wholly frivolous. *Id.* If deemed frivolous, counsel's motion to withdraw is granted, new counsel is denied, and the trial court's judgment is affirmed. *Id.*

**{¶14}** Counsel filed a no-merit brief, which raised several potential issues but ultimately concluded there was no error. We granted Lashley 30 days to file a pro se brief, which he failed to file.

### Guilty Plea

**{¶15}** In the typical *Anders* case involving a guilty plea, the only issues that can be reviewed relate to the plea or the sentence. See, e.g., *State v. Verity*, 7th Dist. No. 12 MA 139, 2013–Ohio–1158, ¶ 11.

**{¶16}** A guilty plea must be made knowingly, voluntarily and intelligently. *State v. Sarkozy*, 117 Ohio St.3d 86, 2008–Ohio–509, 881 N.E.2d 1224, ¶ 7. If it is not, it has been obtained in violation of due process and is void. *State v. Martinez*, 7th Dist. No. 03 MA 196, 2004–Ohio–6806, ¶ 11, citing *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). When determining the voluntariness of a plea, this court must consider all of the relevant circumstances surrounding it. *State v. Johnson*, 7th Dist. No. 07 MA 8, 2008–Ohio–1065, ¶ 8, citing *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

**{¶17}** The trial court must engage in a Crim.R. 11(C) colloquy with the defendant in order to ensure that a felony defendant's plea is knowing, voluntary and intelligent. *State v. Clark*, 119 Ohio St.3d 239, 2008–Ohio–3748, 893 N.E.2d 462, ¶ 25–26. During the colloquy, the trial court is to provide specific information to the defendant, including constitutional and nonconstitutional rights being waived. Crim.R. 11(C)(2); *State v. Francis*, 104 Ohio St.3d 490, 2004–Ohio–6894, 820 N.E.2d 355.

**{¶18}** The constitutional rights the defendant must be notified of are the right against self-incrimination, to a jury trial, to confront one's accusers, to compel witnesses to testify by compulsory process, and to have the state prove guilt beyond a reasonable doubt. Crim.R. 11(C)(2)(c); *State v. Veney*, 120 Ohio St.3d 176, 2008–Ohio–5200, 897 N.E.2d 621, ¶ 19–21. A trial court must strictly comply with these

requirements. *Id.* at ¶ 31; *State v. Ballard*, 66 Ohio St.2d 473, 477, 423 N.E.2d 115 (1981). "Strict compliance" does not require a rote recitation of the exact language of the rule. Rather, a reviewing court should focus on whether the "record shows that the judge explained these rights in a manner reasonably intelligible to the defendant." *Id.* at paragraph two of the syllabus.

**{¶19}** The nonconstitutional rights the defendant must be informed of are the effect of his plea, the nature of the charges, and the maximum penalty, which includes an advisement on post-release control if applicable. Further, a defendant must be notified, if applicable, that he is not eligible for probation or the imposition of community control sanctions. Finally, this encompasses notifying the defendant that the court may proceed to judgment and sentence after accepting the guilty plea. Crim.R. 11(C)(2)(a)(b); *Veney*, 120 Ohio St.3d 176 at ¶ 10–13; *Sarkozy*, 117 Ohio St.3d 86, at ¶ 19–26. The trial court must substantially comply with these requirements. *State v. Nero*, 56 Ohio St.3d 106, 108, 564 N.E.2d 474 (1990). "Substantial compliance means that under the totality of the circumstances the defendant subjectively understands the implications of his plea and the rights he is waiving." *Id.* at 108. In addition to demonstrating the trial court did not substantially comply with Crim R. 11(C)(2)(a)(b) the defendant must also show a prejudicial effect, meaning the plea would not have otherwise been made. *Veney*, 120 Ohio St.3d 176 at ¶ 15 citing *Nero*, 56 Ohio St.3d at 108.

**{¶20}** The trial court's advisement of Lashley's constitutional rights strictly complied with Crim.R. 11(C)(2)(c), and he indicated he understood he was giving up all of those rights. The trial court also substantially complied with Crim.R. 11(C) when advising Lashley of his nonconstitutional rights. As the trial court's colloquy with Lashley complied with Crim.R. 11(C), the plea was knowingly, voluntarily, and intelligently entered. Further, trial counsel was not ineffective with regard to the plea proceedings.

**Pre-Sentence Motion to Withdraw Guilty Plea**

**{¶21}** Regarding the pre-sentence motion to withdraw guilty plea, The Ohio Supreme Court has stated that trial courts should "freely and liberally" grant pre-sentence motions to withdraw guilty pleas. *State v. Xie*, 62 Ohio St.3d 521, 527, 584 N.E.2d 715 (1992). That, however, does not mean a defendant has an absolute right to withdraw a guilty plea prior to sentencing. *Id.* at paragraph one of the syllabus. Rather, there must be "a reasonable and legitimate basis for withdrawal of the plea." *Id.* A trial court's decision regarding a plea withdrawal motion is reviewed under an abuse of discretion standard. *Xie* at 526. "Abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *State v. Dixon*, 7th Dist. No. 10 MA 185, 2013–Ohio–2951, ¶ 21.

**{¶22}** The factors to be considered when making a decision on a motion to withdraw a guilty plea are: 1) prejudice to the state; 2) counsel's representation; 3) adequacy of the Crim.R. 11 plea hearing; 4) extent of the plea withdrawal hearing; (5) whether the trial court gave full and fair consideration to the motion; 6) timing; 7) the reasons for the motion; 8) the defendant's understanding of the nature of the charges and the potential sentences; and 9) whether the defendant was perhaps not guilty or has a complete defense to the charge. *State v. Cuthbertson*, 139 Ohio App.3d 895, 898–899, 746 N.E.2d 197 (7th Dist. 2000), following *State v. Fish*, 104 Ohio App.3d 236, 661 N.E.2d 788 (1st Dist.1995) No one factor is determinative. *See State v. Morris*, 7th Dist. No. 13MA19, 2014–Ohio–882, ¶ 22. "Rather, it is a weighing process." S*tate v. Peck*, 7th Dist. No. 14 MA 56, 2015–Ohio–1279, ¶ 24, citing *Cuthbertson*, 139 Ohio App.3d at 899.

**{¶23}** First, there is no indication in the record of prejudice to the State, so this factor weighs in favor of Lashley. Second, Lashley was more than adequately represented by counsel, in having six counts dismissed and avoiding a sex offender classification. Defense counsel did not present arguments for the plea withdrawal motion at the hearing because Lashley filed the motion and declined to tell his attorney about it, despite the fact that the attorney had visited Lashley in the jail the

day before the hearing.  This factor favors the State.

**{¶24}** Third, the plea hearing was adequate. Lashley stated that he had reviewed the plea agreement with his attorney and acknowledged that he was waiving his constitutional rights to a trial. Lashley further indicated that his plea was voluntary, not forced and not based on any promises. This factor favors the State.

**{¶25}** Fourth, the plea withdrawal hearing was held, during which Lashley and the prosecutor both presented arguments. Defense counsel was present, but did not make arguments because Lashley did not inform him about the motion. Lashley expressed displeasure with his counsel, and claimed he had new evidence but said he did not share this evidence with counsel because counsel had taken "nine months" to return other evidence to Lashley. The prosecutor then made her arguments, noting, among other things, that defense counsel had negotiated an excellent plea deal for Lashley and that Lashley failed to profess his innocence during the pre-sentence investigation, instead conceding that the night had " 'got out of hand[,]' " and that he " 'was drunk, high, and just plain being selfish.' "   The trial court then overruled the motion. Thus, a hearing was held, and both sides presented arguments before a ruling was made. This factor favors the State.

**{¶26}** Fifth, the record is unclear what consideration the trial court gave to the motion. Both parties were heard before a ruling was made but the trial court did not state on the record the basis for its ruling. However, the record also contains no evidence of irregularity by the trial court. Therefore, this factor is neutral to both parties. Sixth, Lashley's motion was filed two weeks before the hearing, and approximately two weeks after the plea hearing. This time is reasonable and favors Lashley.

**{¶27}** Seventh, the reason for Lashley's motion was his dissatisfaction with counsel and an allegation that he had new evidence. However, counsel met with Lashley, received evidence from Lashley, negotiated a Crim.R. 11 plea agreement which dismissed six counts against Lashley and avoided a sex offender classification. Further, although Lashley claimed he had additional evidence, he admitted to

concealing it from counsel. The record indicates that this purported new evidence may not have been new, but rather new copies of the evidence that Lashley had already provided to counsel. Regardless, the evidence is immaterial given Lashley's admissions in the presentence investigation report that he had been out of control on the night of the offense and was now paying the penalty for that, which was read into the record during the hearing. This factor favors the State.

**{¶28}** Eighth, Lashley understood the charges against him and the potential sentences. During the plea hearing, Lashley stated he understood the potential penalties for the charges to which he was pleading guilty, which could have been a possible 38 years in prison. This factor favors the State.

**{¶29}** Finally, the record does not support that Lashley may not have been guilty or that he had a complete defense to the charges. In his presentence investigation, Lashley admitted to being under the influence of substances, being out of control, and being selfish, resulting in the loss of his family and freedom. The victim gave a compelling statement about her ordeal which, along with photographs, strongly supports Lashley's guilt. This factor also favors the State.

**{¶30}** Given that the majority of the *Fish* factors favor the State, there are no appealable issues with regard to the trial court's denial of Lashley's pre-sentence motion to withdraw his guilty plea.

### Sentencing

**{¶31}** First trial counsel was not ineffective with respect to sentencing. Regarding the sentence itself, appellate courts review a felony sentence to determine whether the trial court's findings—or where findings are not required, the sentence itself—are clearly and convincingly unsupported by the record, or whether the sentence is otherwise contrary to law. R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1; ¶ 23.

**{¶32}** Regarding merger of any or all of the offenses, this issue was not raised in the trial court. In *State v. Underwood*, 124 Ohio St.3d 365, 2010–Ohio–1, 922 N.E.2d 923, the Ohio Supreme Court held that the requirement to merge allied

offenses is mandatory, occurs at sentencing, is reviewable on appeal even pursuant to a Crim.R. 11 agreement, and may be reviewed for plain error even when no allied offense objection is raised at trial. *Id.* at ¶ 20, 26, 31. "While plain error may be reviewed by an appellate court, plain error must still be demonstrated by the record." *State v. Peck*, 7th Dist. No. 12 MA 205, 2013–Ohio–5526, ¶ 15.

**{¶33}** The Ohio Supreme Court recently stated:

> An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice. Accordingly, an accused has the burden to demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus; absent that showing, the accused cannot demonstrate that the trial court's failure to inquire whether the convictions merge for purposes of sentencing was plain error.

*State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3.

**{¶34}** Pursuant to R.C. 2941.25(A), "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However, "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

**{¶35}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015–Ohio–995, 34 N.E.3d 892, the Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: 1) the

conduct constitutes offenses of dissimilar import, 2) the conduct shows the offenses were committed separately, or 3) the conduct shows the offenses were committed with separate animus. *Id.* at paragraph three of the syllabus, citing R.C. 2941.25(B). Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶36} Lashley was convicted of two counts of kidnapping, one pursuant to R.C. 2905.01(A)(2) and the other R.C. 2905.01(A)(3), which provide:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another[.]

{¶37} Additionally, he was convicted of two counts of felonious assault, one pursuant to R.C. 2903.11(A)(1), and the other pursuant to R.C. 2903.11(A)(2)(D), which provide:

> (A) No person shall knowingly do either of the following:
>
> (1) Cause serious physical harm to another * * *
>
> (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.

{¶38} These crimes were all committed on the same day, with the same victim, over an approximately three-hour time period. The victim gave a very detailed description of the crimes during sentencing:

So once the time came where I was exhausted trying -- tired of trying, I felt lifeless, hopeless. He had stolen my joy, my happiness. I told him I couldn't do this anymore. I gave everything to God in that moment. Nothing else was working, so I figured I would try God. I finally threw in the towel. A little while later I went to go lay down in bed because I had to be at work at four a.m. I had to work a whole 12 hours because I missed so much work. He came in the room, and he ripped the blankets off me. He ripped them off two times. Each time I got up and I pulled the blankets back on me and I said, Elijah, please stop; I have to be up early for work. I need to go to sleep. He laid down next to me and he asked me, why can't you do this? I said, look at all that you've done. I can't be with you anymore. I stopped loving myself. I'm tired of all this. You need to go. He then pulled my hair, and I told him I was going to call the police. He then grabbed my phone, and he threw it across the room. As I attempted to get up to get my phone, he jumped on me, sitting on my stomach, saying you're not sending me to jail again. I really wasn't going to call the police. I just wanted to scare him so that he would just leave me alone. Then he started to choke me, telling me that he was going to kill me before I went to jail again. I no longer felt the pain in my -- I no longer felt the pain of his hand around my throat. I couldn't hear anything, and I'm pretty sure I blacked out.

He then released my neck, and I didn't know what was going on. I was scared. I tried to get him off of me. I started to fight back. Due to the memory from the mattress, I was unsuccessful. He was so sweaty, I couldn't even scratch him. My hands kept slipping and sliding all over the place. We were knocking stuff over, and I hit him -- I hit him in the face a couple times. He said, you want to fight back now? Then he grabbed a cord off the headboard and he ties my left hand up and pulls it to my neck and wraps the cord around my neck two times and pulls it,

strangling me. My right hand was still loose. I tried to go for his eye. He grabbed my right hand, and he ties it. I started praying the Lord's prayer out loud, scared, not knowing why this man that claimed to love me would hurt me like this. He then hit me with something, not sure what it was, but my eye flashed a couple times.

Then he ripped my dress and my bra in half. Before all this started, I had told him that I didn't want to have sex with him. I was not feeling it. And for a woman, we have to be physically and mentally into it. I was neither. I persisted to tell him that I didn't want to have sex with him. And because he had me tied up and I was scared, I had told him to go ahead. Go ahead, Elijah, just take it and go. Just leave. Don't hurt me anymore, please. I begged him. I was sliding off the bed and was stuck on the metal bedrails causing a lot of pain to my butt area. I was trying to fight back to get him off of me because I didn't want to have sex with him. He told me to move up on the bed. I said no. Then he pulled the cord again forcing me to move up, choking me in the process. I started asking God to forgive him for he didn't know what he was doing. I kept thinking in this moment I was going to die, I was -- if I was going to die, I was going to go to Heaven.

While he had sex with me, he pulled out and came on my face. He knew I was not into that. It is so gross. I think it is a disgrace for women to have that done. He proceeded to have sex with me five more times -- or five times total. He came in different places on my body. I found it very gross. The crazy thing for me was that Elijah had never been into having sex while being tied up. And we had bed restraints, and we only used them one time the whole five-years that we were together. And for him to penetrate for the two minutes that he did each time, he came so fast that I found it very disturbing because at this point

I was tied up with wire and he was choking me. And if this was his fetish, it was something I didn't know about.

After he got what he wanted and he did what he did to me, I thought he was going to leave, but he didn't. He continued to wrap more wires around my neck and my hands. He kept on pulling them tighter and tighter to the point where I could barely breathe. He sat on top of me and started shoving his fingers between my throat and the wires continually causing pain to my neck. I remember laying there gasping for air hardly being able to catch my breath. I could feel my heart slow down. Things started to look fuzzy. As I laid there tied up with wires and could not move, I honestly thought I was dying a few times. While I was going through this, I remember just wishing that he would have just choked me to death than have to make me suffer with the cord around my neck and the pain and bruises he inflicted on my hand, arms, legs, and buttocks, the humiliation of the rape and the fear he caused me not knowing what he was going to do to me next. The gasping for air for this was worse. I would never wish this on any living creature ever. It seems like this torture went on for days and he was never going to stop.

I started singing songs to God, anything that I could think of. He backs up off the bed, and he looks at me laying there. He stands at the foot of the bed and he -- and the look in his eyes, it wasn't him. I'm still singing because of the -- in between the breaths of air I was able to get and crying out for him to just leave me alone and stop hurting me. And I asked him, why are you doing this? All he could say was because I'm not going [to] jail. He was going to kill me before he goes back to jail. His eyes were dark, and they were not his at all. It was as if a demon had took him over, and I wasn't scared anymore. I gave everything to

God in that moment and totally forgave him. As he steadily choked me, he said I'm not going to kill you. God saved your life. I started crying, and I asked him to please release me. I told him and I promised him I would not call the police. I told him just to take my cards, my money, the car, my phone, just please let me go.

After three hours of him raping me and choking me and tying me with anything he could get his hands on, he said maybe I should kill you. I'm going to prison anyway. I'm going to burn the house down and leave you in it to burn to death. Better yet, I'll leave the gas on and let you die a slow death. I then started to get scared because I didn't know what he was going to do when I was tied up. I couldn't move. I never thought that he would have tied me up and choked me and raped me. And he did all this crazy stuff to me. He never -- I never, never -- because I trusted him. I married him for goodness sakes.

I remember the name of Jesus had saved me, and he was right there with me saving my life. The fear started to go away. I thought at that moment I needed to be smart I told him and I promised him I would not call the police. I told him just to take my cards, my money, the car, my phone, just please let me go.

I remember the name of Jesus had saved me, and he was right there with me saving my life. The fear started to go away. I thought at that moment I needed to be smart and not let him know that I was able to wiggle my hand out. And he left the room. I started to wiggle my right hand out. It was too tight. A couple minutes later he comes back in with a roll of duct tape. He sticks a sock in my mouth and he tapes it. He wrapped the tape completely around my head, through my hair, and around the front of my face leaving my nose to breathe. I was lying

there thinking, okay, that's it. He's done. No, he wasn't. He then proceeded to tape my hands. My left hand -- I left my right hand loose in hopes I would be able to wiggle my fingers out. Then he tapes around my head again. My left hand was so numb I could no longer feel it. I begged him to please loosen it, but he wouldn't. I thought it was going to fall off. He took some stuff. I'm not sure exactly what. I couldn't move my head or my body at all. I knew definitely that he took the stuff that I told him to take.

When I heard the van pull off, I wiggled my fingers out of the tape on my right hand. I reached over to unhook the bed restraints from my left arm, choking myself in the process because of the way he had me tied up. It was like a shoestring. He wrapped it around my neck, and he looped it once. And then he pulled it and tied my hands up. So every time I pulled my hands, it would tighten around my neck. As soon as I got the bed restraints off, I was able to run next door, and I took everything with me including the bed sheets. I believe it was the bed sheets, the restraint, the wires, and all of which I'm sure you've seen in the pictures.

When I ran to the neighbor's house, I was pretty much naked. I kicked on the door, and he answered the door. He told me to come in. I asked him to call the police, and I told him that my husband had tried to kill me. So he called the police. As we waited for the police to arrive, I begged him to cut the wires off my left hand. My left hand was so numb, I literally thought it was going to fall off. But he wouldn't. He wanted to wait for the police to arrive. Then the police finally arrived and saw me. They took pictures, and I had told them to cut the wires off my left hand. I thought to myself if I lose a hand, oh, well, at least I'm alive. They cut the duct tape, and they were shocked to see all the wires and cords, the

belts and whatever else was around my neck. I went to the hospital and was looked over. The duct tape that was in my hair, the nurses couldn't even get it out. So they tried to use this chemical to remove it, and I remember it burned so bad because I had wire burns on the back of my neck.

**{¶39}** Consistent with the holding in *Ruff,* the victim's description supports Lashley's convictions for at least two felonious assaults and at least two instances of kidnapping, all four convictions committed separately and/or with separate animus. Accordingly, the trial court did not commit plain error by failing to merge these four convictions.

**{¶40}** Moving on to other potential sentencing issues, Lashley was afforded his allocution rights pursuant to Crim.R. 32(A)(1). That the trial court chose to deviate from the jointly-recommended sentence does not constitute error because the trial court forewarned Lashley during the plea hearing of the applicable penalties, including the possibility of imposing a greater sentence than that recommended by the prosecutor. *See State v. Vari,* 7th Dist. No. 07–MA–142, 2010–Ohio–1300, ¶ 24. The trial court emphasized that the 10-years in the plea agreement was merely a "recommendation."

**{¶41}** The trial court properly notified Lashley that upon his release from prison he would be subject to a mandatory five-year period of post-release control and explained the ramifications of violating post-release control. *See* R.C. 2967.28(B)(1).

**{¶42}** The 13-year prison sentence Lashley received is within the 3 to 38 year range for the charges. *See* R.C. 2929.14(A)(1) and (2). The trial court considered the principles and purposes of felony sentencing and the sentencing factors. R.C. 2929.11 and R.C. 2929.12. Jail-time credit was properly imposed.

**{¶43}** Regarding consecutive sentences, R.C. 2929.14(C)(4) requires three findings: that consecutive sentences are 1) necessary to protect the public from future crime or to punish the defendant; 2) not disproportionate to the seriousness of

the defendant's conduct and the danger the defendant poses to the public; and 3) one of three alternative findings set out in subsections: a) the defendant was under post-release control, specified statutory community control, or awaiting trial/sentencing; b) the offenses were committed during a course of conduct and the harm was so great/unusual that a single term does not reflect the seriousness of the defendant's conduct; or c) the defendant's criminal history demonstrates the need to protect the public from future crime by the defendant. R.C. 2929.14(C)(4).

**{¶44}** The findings supporting consecutive sentences must be made both at the sentencing hearing and in the entry. *Bonnell*, *supra*, 140 Ohio St.3d 209, ¶ 37. But a trial court is not required to state reasons supporting its findings or use magic or talismanic words, so long as it is apparent the court conducted the proper analysis. *State v. Jones*, 7th Dist. No. 13 MA 101, 2014–Ohio–2248, ¶ 6; see also *Bonnell* at ¶ 37. *Post-Bonnell*, we may liberally review the entire sentencing transcript to discern whether the trial court made the requisite findings. *Bonnell* at ¶ 29. However, as demonstrated by the outcome in *Bonnell*—the Supreme Court reversed and remanded Bonnell's sentence because the trial court failed to make a proportionality finding—there are limits to that deference. *Bonnell* at ¶ 33–34. After a reviewing court determines the findings have been made, the court "must also determine whether the record contains evidence in support of the trial court's findings." *State v. Correa*, 7th Dist. 13 MA 23, 2015–Ohio–3955, ¶ 76, citing *Bonnell* at ¶ 29.

**{¶45}** The trial court made the following consecutive sentence findings during the hearing:

> The Court further finds that consecutive sentences are necessary to protect the public from any future crime of the offender and they're no[t] disproportionate with the seriousness of the offender's conduct and the danger the offender possesses to the public.

> The Court also finds that this offense was committed as part of one or more courses of conduct and that the crime is so serious that it -

- the offender did not show much remorse.

The Court further finds that consecutive sentences, based on the defendant's actions, are necessary to protect the public of future crimes.

**{¶46}** As conceded by appellate counsel, the findings made at the hearing are sufficient, and the record contains ample evidence to support them.

**{¶47}** However, counsel neglected to assert that the trial court failed to make *specific* consecutive sentence findings in the sentencing entry. Instead, the trial court cut and paste the entirety of R.C. 2929.14(C)(4) into the entry, without denoting which specific findings applied to this case. This is error. *State v. Williams*, 7th Dist. No. 16MA0041, 2017-Ohio-856.  Since adequate findings were made during the hearing, a remand to the trial court is warranted with instructions to issue a nunc pro tunc sentencing entry setting forth the applicable findings.

**{¶48}** In sum, there are no appealable errors with regard to Lashley's plea or the plea withdrawal motion. However, the trial court failed to make consecutive sentence findings in the entry. Accordingly, the judgment of the trial court is reversed in part, and a limited remand is ordered for the trial court to issue a nunc pro tunc sentencing entry that includes the specific consecutive findings applicable to Lashley.

Donofrio, J., concurs.

Waite, J., concurs.